[Cite as *Stanley v. Ohio State Univ. Med. Ctr.*, 2012-Ohio-6351.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ALAN STANLEY, Guardian, etc.

    Plaintiff

    v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER

    Defendant

Case No. 2009-08683

Judge Joseph T. Clark

## DECISION

{¶ 1} Plaintiff brought this action against defendant, The Ohio State University Medical Center (OSUMC), alleging medical malpractice and loss of consortium based upon medical treatment provided to plaintiff's wife, Marie Stanley.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} In March 2007, Marie was treated by Kenneth Parker, M.D., an otolaryngologist, for complaints of progressive hearing loss and ringing in her right ear. In June 2007, an MRI confirmed the presence of an acoustic neuroma, a tumor which originates from the balance nerve. Although acoustic neuromas are typically slow growing, the tumor can potentially grow large enough to compress the brainstem, causing symptoms including blindness and hydrocephalus (an accumulation of fluid in the brain). Dr. Parker referred Marie to Abraham Jacob, M.D., who at the time of treatment was an assistant professor at The Ohio State University's department of

otolaryngology, specializing in cranial based surgery.  On June 20, 2007, Marie had a four-year history of progressive hearing loss in her right ear and Dr. Jacob noted an MRI showed the presence of an acoustic neuroma.

{¶ 3} Dr. Jacob testified that he informed Marie of the risks and benefits of the each of the available treatment options; observation with further testing, surgery to remove the tumor, and radiation treatment.  (Defendant's Exhibit 1.)  Marie ultimately chose to have surgery performed at OSUMC to have the tumor removed.  (Defendant's Exhibit 2.)  On June 16, 2008, plaintiff was admitted to OSUMC where Dr. Jacob performed the surgery with the assistance of a resident, Agnes Hurtuk (formerly Oplatek), M.D.  The surgery was successfully completed without complication and Marie was admitted to the surgical intensive care unit (ICU).  Dr. Jacob testified that Marie was "doing well" immediately after surgery and he prescribed pain medication for expected headaches.

{¶ 4} The following day, Marie was transferred to the main hospital floor.  Dr. Jacob noted that his post operative examination revealed that Marie's facial nerve appeared to work well without any sign of compromise.  On June 17, 2008, Marie complained of headaches of varying degree which were effectively controlled with pain medication.  Marie's vital signs and neurologic status were monitored and determined to be normal.

{¶ 5} On June 18, 2008, at 1:00 a.m., Marie rated the pain she was experiencing as a 6 out of 10, with 1 being low and 10 being high.[2]  Marie was provided pain medication and at 2:00 a.m. her pain had decreased to 4 out of 10.  At approximately 7:30 a.m., Dr. Jacob visited Marie and noted that she was not having any problems and that she expressed a desire to go home soon.  Dr. Jacob testified that the nurses

---

[1]Although the complaint lists Mrs. Stanley's first name as Maria, medical records and testimony from her family refer to her as Marie.

[2]Unless otherwise noted, all times in this decision refer to June 18, 2008.

attending to Marie had standing orders to assess her vital signs and neurological condition every four hours.

{¶ 6} According to the "patient flow sheet" for June 18, 2008, at 8:00 a.m., Marie complained of nausea and reported her pain as 9 out of 10. (Defendant's Exhibit 6, p. 82.) Jenny Twomley, RN, gave Marie medication for her nausea and pain. Twomley testified that the medical records show that plaintiff's 8:00 a.m. neurological assessment was normal. At 8:40 a.m., Nurse Twomley returned to give Marie Phenergan, an anti-nausea medication. Marie received additional medication for nausea at 9:00 a.m. Twomley testified that during her 9:00 a.m. visit, Marie was neurologically stable and alert. Twomley noted that Marie responded to the pain medication, reporting 3 out of 10 pain at both 9:00 and 10:00 a.m. By 10:00 a.m., Marie's nausea had resolved and she continued to be alert and oriented. According to the medical records, at 10:35 a.m., Marie related that her headache pain had increased to 10 out of 10 and, based upon a standing order, Twomley administered intravenous (IV) morphine for the pain. Twomley notified Dr. Hurtuk concerning Marie's headache pain and she continued to monitor Marie's condition. Twomley testified that she administered insulin to Marie at 11:15 a.m. as a result of a blood glucose test and that she returned at 11:55 a.m. to give her a scheduled dose of pain medication. At noon, Marie's headache pain had decreased to a reported level of 3 out of 10 and Twomley reported that Marie's neurologic status remained normal.

{¶ 7} At 1:00 p.m., Marie told Twomley that she had a 10 out of 10 headache which was "the worst pain since surgery." As a result, Twomley notified Dr. Hurtuk concerning Marie's status, including her vital signs and neurological condition. Dr. Hurtuk told Twomley that she intended to check Marie's head dressing when she returned from the clinic to make sure that it was not too tight. Dr. Hurtuk testified by way of deposition that after she received the information related by Twomley, she notified Dr. Jacob about her conversation with Twomley and she ordered a different

type of pain medication that would provide relief for a longer period of time. At 1:30 p.m., Twomley noted in the medical records that Marie was sleeping. At 2:00 p.m., Twomley performed a scheduled check of Marie's IV site and Marie reported that her pain had decreased to 3 out of 10.

{¶ 8} When Twomley returned to administer medications at 2:15 p.m., she noticed that Marie was drowsy and when she performed a neurologic examination, Twomley detected left-side weakness in Marie's grasp. Twomley notified Dr. Hurtuk and the charge nurse of the change in Marie's condition. By 2:30 p.m., Twomley noticed that Marie continued to exhibit weakness in her left grasp. The medical records show that at 2:50 p.m., Marie received Narcan, a narcotic reversal agent and Twomley began preparing her for a "stat" CT head scan. Twomley testified that Marie's vital signs were stable when the "stat nurse" took her to the CT scan at 3:10 p.m.

{¶ 9} The CT scan and report were complete at 3:25 p.m. and showed evidence of a large hemorrhage in both the subarachnoid and subdural area of the brain and hydrocephalus, an abnormal increase in the amount of fluid within the cranial cavity. By 3:50 p.m., Marie had become "non-responsive" and she was intubated and monitored by John McGregor, M.D., a neurosurgeon. As a result of the CT scan, Dr. McGregor ordered several tests to prevent secondary injuries. A ventriculostomy was performed to drain excess spinal fluid from the brain. Dr. McGregor testified that the ventriculostomy was successful and that the recorded cranial pressure was normal. In an attempt to locate the source of the bleed, a CT angiogram (CTA) was performed to detect any abnormal blood vessels or the presence of an aneurysm; however, the test did not show any such abnormality. Next, an MRV (magnetic resonance venogram) was performed which did not show any obstruction of the veins that could have caused the hemorrhage. However, an MRI (magnetic resonance imaging) showed areas of both brain ischemia, deficient supply of arterial blood, and infarct, dead brain tissue.

{¶ 10} Dr. McGregor testified, that based upon the test results, he anticipated that Marie would experience further swelling of the brain and he recommended another surgery to remove a portion of the skull to allow the cerebellum to expand, to prevent secondary damage as a result of swelling. At approximately 9:45 p.m., Dr. McGregor successfully performed the surgery.

{¶ 11} Plaintiff alleges that OSUMC's medical staff deviated from the accepted standard of care in that the nursing staff failed to properly respond to Marie's symptoms and complaints; there was a delay in performing a CT scan upon detection of changes in Marie's neurological condition; and Dr. McGregor failed to timely perform surgery after he became aware of the hemorrhage.

{¶ 12} In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must first prove: 1) the standard of care recognized by the medical community; 2) the failure of defendant to meet the requisite standard of care; and 3) a direct causal connection between the medically negligent act and the injury sustained. *Wheeler v. Wise*, 133 Ohio App.3d 564 (1999); *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976). The appropriate standard of care must be proven by expert testimony. *Bruni, supra,* at 130. That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. *Id.*

{¶ 13} Plaintiff presented the testimony of three experts. Dr. Stephen Bloomfield, M.D., testified that he is board certified in neurosurgery and an assistant professor of neurosurgery at Seton Hall University. Dr. Bloomfield explained certain aspects of the anatomy of the brain, including the difference between the subdural and subarachnoid spaces. Dr. Bloomfield explained that it is important to know whether the CT scan showed bleeding in either or both spaces, inasmuch as the location and source of bleeding is critical in determining the proper course of treatment. According to Dr. Bloomfield, the CT scan that was complete at 3:25 p.m. showed hydrocephalus and

subdural bleeding around the cerebellum and brain stem, conditions which required immediate surgical intervention to prevent damaging compression of the brain. Dr. Bloomfield testified that the MRI which was performed approximately five and a half hours later confirmed that the subdural hematoma was getting larger and was located both around the brain stem and behind the cerebellum. Dr. Bloomfield related that Dr. McGregor successfully performed decompression surgery by removing a portion of Marie's skull to decrease pressure on the brain and allow the cerebellum to expand.

{¶ 14} Dr. Bloomfield opined that the medical records showed that Marie experienced a slow, progressive, neurologic deterioration. Specifically, Dr. Bloomfield opined that the nausea and vomiting that Marie experienced in the morning of June 18 was a neurologic symptom which was concurrent with a severe headache and that the standard of care required defendant's medical staff to evaluate Marie's neurological condition. According to Dr. Bloomfield, Marie's deteriorating neurologic condition was consistent with the hemorrhage depicted in both the CT scan and MRI. Dr. Bloomfield testified that Marie most likely began to experience neurologic deficits at approximately 1:00 p.m., but the medical records do not show an assessment at that time. Dr. Bloomfield opined that Dr. McGregor deviated from the standard of care by not taking Marie to surgery within one hour after he received the results of the 3:25 p.m. CT scan and that the delay in surgery was the proximate cause of Marie's neurologic injuries. Dr. Bloomfield testified that the tests that were conducted after the CT scan, including the MRI, were neither necessary to evaluate Marie's condition nor required prior to performing decompression surgery.

{¶ 15} Plaintiff's radiology expert, Michelle Whiteman, M.D., is a board certified radiologist with a sub-specialty in neuroradiology. Dr. Whiteman agreed with Dr. Bloomfield that the CT scan showed subdural bleeding. Dr. Whiteman testified that her review of both the CT scan and the MRI showed a separation of the subdural and subarachnoid spaces and that the bleeding was subdural, causing the subarachnoid

space to become compressed. According to Dr. Whiteman, the subdural blood and compression moved the cerebellum up and forward such that the flow of cerebral spinal fluid was obstructed, causing dilated ventricles and hydrocephalus. Dr. Whiteman testified that the computer generated measurements that were based upon CT scan images of the brain stem did not show hypodensity. Dr. Whiteman was critical of the CT scan report in that it refers to subarachnoid rather than subdural blood. Dr. Whiteman agreed with Dr. Bloomfield's opinion that the distinction between subdural and subarachnoid blood is critical in developing a treatment plan. However, on cross-examination, Dr. Whiteman conceded that the report did refer to a subdural hemorrhage and that density measurements are not used to make diagnosis in clinical practice. Furthermore, Dr. Whiteman testified that a CT scan can appear "normal" even though the patient has an irreversible injury due to infarct. Plaintiff's nursing expert Melissa Popovich, R.N., explained the nursing notes in Marie's medical record. Popovich testified that Twomley did not adequately document Marie's changing condition, particularly the complaints of headache pain and crying. According to Popovich, if Twomley became aware that Marie had been crying, she should have completed further assessments, documented her findings in the medical record, and conveyed her findings to the treating physician. Popovich opined that Twomley should not have allowed Marie to remain asleep at 1:30 p.m. and that Twomley's failure to wake plaintiff and perform a neurologic assessment fell below the standard of care. Popovich further opined that Twomley should have informed the nursing supervisors that Dr. Hurtuk was unable to immediately return from the clinic to assess Marie's headache complaint. Popovich testified that she did not have any criticism of the conduct of the nursing staff after Marie's neurologic deficits were detected at approximately 2:15 p.m.

{¶ 16} Defendant's first expert, Abraham Jacob, M.D., is board certified in both otolaryngology head and neck surgery and cranial surgery. Dr. Jacob testified that he has published and presented numerous articles concerning acoustic neuromas, with an

emphasis on the management of the condition.  At the time of the trial, Dr. Jacob had performed over 120 acoustic neuroma removal surgeries.  Dr. Jacob described the surgery he performed on Marie and the symptoms that patients who undergo the procedure typically experience, including hearing loss, dizziness and fairly severe headache pain. According to Dr. Jacob, the pain that patients experience often increases as their recovery progresses and they become more active following surgery. Dr. Jacobs testified that it is common for his patients to report 10 out of 10 headache pain and that the level of pain often "waxes and wanes" during the recovery period as adjustments are made in pain control medications.  Dr. Jacobs stated that intra cranial bleeding causes both a severe headache and changes in the patient's neurologic status.  Dr. Jacobs opined that a severe headache alone does not indicate a head bleed, that there was no indication of a head bleed immediately following the surgery, and that the head bleed that Marie experienced was an extremely rare complication.

{¶ 17} Dr. Jacobs recalled examining Marie at approximately 7:30 a.m. on June 18 and he noted that she did not report any problems and expressed a desire to go home soon.  Later that morning, Dr. Jacobs received a call from Dr. Hurtuk who informed him that Marie reported headache pain, that she was given pain medication, and that there was no change in her vital signs or neurologic condition.  Dr. Jacobs testified that in the early afternoon, he learned that Marie's headache had recurred, but that there was still no change in either her neurologic condition or vital signs.  Later in the afternoon, after Dr. Jacobs was informed that Marie exhibited a neurologic deficit, he dispatched Dr. Hurtuk to examine her and he traveled to OSUMC where he found plaintiff awake, but not following conversation.  Dr. Jacobs testified that Dr. McGregor took over care for Marie after the CT scan confirmed that her condition required neurosurgical attention; however Dr. Jacobs remained present at the hospital throughout the evening, including when he observed the decompression surgery.

{¶ 18} Dr. McGregor, the attending neurosurgeon, is board certified in neurosurgery and his medical training focused on skull based neurosurgery and aneurysm surgery. Dr. McGregor has published articles on acoustic neuromas, and both subarachnoid and subdural hemorrhages. During his career, he has treated several hundred patients with intracranial bleeds, and approximately 150 acoustic neuroma patients.

{¶ 19} Dr. McGregor became involved with treating Marie after the CT scan was performed at approximately 3:25 p.m. Dr. McGregor testified that he noted a substantial hemorrhage in the lower area of the brain, hydrocephalus, and areas of infarct which is represented as a change in the density of the brain tissue that was likely caused by loss of blood flow. Dr. McGregor explained that hydrocephalus occurred where blood filled in the "fluid spaces" of the brain, such that blood clogs the transfer of spinal fluid. Dr. McGregor opined that Marie's neurologic deficits were consistent with brain injury caused by infarct. Dr. McGregor testified that the images of Marie's brain showed that blood was present in front of the brain stem, areas where surgeons could not access the blood in any meaningful way. According to Dr. McGregor, the normal intra cranial pressure reading obtained during the ventriculostomy showed that there was normal blood flow to that portion of the brain, supporting his belief that Marie's coma was caused by infarct, and not pressure in the brain. Dr. McGregor testified that the results of both CTA and MRV were negative, showing that neither an abnormal blood vessel nor a venous occlusion caused the hemorrhage. Dr. McGregor opined that the MRI confirmed that there was an infarct on the brain and that he recommended surgery to remove a portion of Marie's skull to give the cerebellum room to expand and prevent injury due to swelling.

{¶ 20} Defendant's surgical expert, Kevin Brown, M.D., is a neurotologist, specializing in skull-based surgery. Dr. Brown has performed acoustic neuroma surgery and published multiple articles on the condition. Dr. Brown testified that the vast

majority of patients report significant headaches after acoustic neuroma surgery and that such headaches can be very severe and occur for a number of reasons. According to Dr. Brown, a head bleed following acoustic neuroma surgeries is a rare but known risk of the surgery. Dr. Brown agreed with Dr. McGregor's opinion that a severe headache alone, without changes in either vital signs or neurologic condition, does not warrant performing a CT scan. Dr. Brown explained in detail the information contained in Marie's medical records and he noted that Marie did not experience a "sudden onset headache" in that her reported headache pain fluctuated throughout the morning and early afternoon on June 18. Dr. Brown opined that his review of the medical records showed that both the surgeons and medical staff attending to Marie responded appropriately to her complaints and symptoms. Specifically, Dr. Brown opined that Marie's neurologic status at both 10:35 a.m. and 1:00 p.m. was normal, meaning that a CT scan was not indicated at those times.

{¶ 21} Defendant also presented the testimony of Michael Lipton, M.D., a neuroradiologist who is board certified in both diagnostic radiology and neuroradiology. Dr. Lipton is an associate professor of radiology and serves as the Medical Director of Magnetic Resonance Services for the Montefiore Medical Center. Dr. Lipton also serves as an attending radiologist at three major New York medical centers, where he reviews images and diagnoses intracranial bleeds on a daily basis. Dr. Lipton provided a detailed explanation of the anatomy of the brain, including both the location of the subdural and subarachnoid areas and the consequences of bleeding in those areas. Dr. Lipton explained how both subdural and subarachnoid bleeding can cause ischemia and infarct; injury from a subdural bleed is typically caused by increased pressure on the brain, whereas ischemic injury from a subarachnoid bleed tends to result from vasospasm.

{¶ 22} Dr. Lipton reviewed the 3:25 p.m. CT scan and testified that it showed extensive intracranial bleeding in both the subarachnoid and subdural areas, including

blood near the brainstem.  Dr. Lipton opined that much of the bleeding was in an area that was not safely accessible for surgical removal.  According to Dr. Lipton, the CT scan showed areas of abnormality or ischemia in the brainstem and cerebellum.  Dr. Lipton testified that comparing the CT scan to the subsequent MRI does not reliably show a progression of damage inasmuch as the more extensive damage shown in the MRI images is likely related to its ability to detect such damage.  Dr. Lipton acknowledged that the 3:25 p.m. CT scan report did not discuss hypodensity.  However, Dr. Lipton related that abnormalities depicted by hypodensity on a CT scan can appear "normal" when there is actually irreversible damage because detecting hypodensity is a subtle finding, and he noted that he had the benefit of knowing the patient's outcome when he examined the images.

{¶ 23} Defendant's neurosurgery expert, Stephen Saris, M.D., has conducted research on brain tumors, trained in acoustic surgery, and is currently the chief of neurosurgery at St. Joseph Hospital in Rhode Island.  Dr. Saris testified that he has performed many acoustic neuroma surgeries and that it is common for patients to report severe headaches, including 10 out of 10 pain, following such surgery.  According to Dr. Saris, the 3:25 p.m. CT scan showed an intracranial hemorrhage, hydrocephalus, and infarction in areas of both the brainstem and cerebellum.  Dr Saris testified that the images showed a large amount of blood in front of the brainstem, an area of the brain that cannot be operated on.  Dr. Saris opined that a severe 10 out of 10 headache alone is not a sufficient reason to order a CT scan for a patient who is recovering from brain surgery.  Dr. Saris opined that the tests that were performed after the 3:25 p.m. CT scan were reasonable and that rushing Marie to surgery prior to receiving the results of those tests "would have been very poor medical judgment" inasmuch as the cause of the bleeding had not been determined.  Dr. Saris testified that any delay after 3:25 p.m. "wouldn't have mattered anyway as she already had an infarct."

{¶ 24} Finally, defendant presented the testimony of its nursing expert, Jenny Beerman, R.N., who has written several textbook chapters regarding nursing standards of care, teaches nurses in a clinical setting, and has over forty years of clinical experience, including caring for patients recovering from brain surgery and head bleeds. Beerman testified that she has been trained to recognize the symptoms of a head bleed which include an increased heart rate and blood pressure, restlessness, decreased level of consciousness, and neurologic changes such as change in pupils and reflexes.

{¶ 25} Beerman reviewed the medical records and explained in detail the nursing care that was provided to Marie on June 18. Beerman testified that a 10 out of 10 headache, by itself, does not indicate a head bleed and that the standard of care did not require Twomley to contact Dr. Hurtuk to report such pain without secondary symptoms of a head bleed. Beerman opined that Twomley communicated properly with both her nursing chain of command and the doctors who were treating Marie. According to Beerman, Twomley conducted timely neurological assessments and properly documented them in the medical records. Beerman testified that Twomley performed timely reassessments after she provided Marie with appropriate pain medication. Beerman opined that, prior to the neurological changes at 2:15 p.m., Twomley had no reason to suspect that Marie was experiencing a head bleed.

**TIMING OF THE HEAD BLEED**

{¶ 26} With regard to the timing and cause of the head bleed, plaintiff relies on the testimony of Dr. Bloomfield who opined that the hemorrhage was caused by the acoustic neuroma surgery and that intra cranial bleeding began in the morning of June 18. Although plaintiff argues that the head bleed occurred as a result of the vomiting that Marie experienced in the early morning, Dr. Bloomfield testified that the head bleed occurred shortly before 10:35 a.m. and he did not suggest that it was either caused or exacerbated by vomiting. Indeed, Dr. Brown was adamant that the hemorrhage did not

occur in the morning inasmuch as Marie responded to pain medication and her neurological condition was not consistent with the symptoms exhibited by a patient experiencing a head bleed.  Dr. McGregor also opined that it would be impossible for Marie to have a normal neurological exam at noon with such a hemorrhage.  Drs. Brown and Saris also testified that if Marie had suffered a head bleed early in the morning, she would not have been alert and responding to questions or have had a normal neurological assessment at noon.  The medical experts agreed that Marie did not exhibit other symptoms that are consistent with a head bleed, such as an increased heart rate and blood pressure.  Based upon the evidence, the court finds that Marie did not have a significant head bleed prior to her noon neurological assessment.

**NURSING CARE**

{¶ 27} With regard to the nursing care that was provided to Marie, Popovich criticized defendant's nursing staff for failing to adequately monitor Marie's condition and report her status to the treating physicians.  Family members testified that Marie was crying and screaming in pain at approximately 11:55 a.m.  According to plaintiff, the testimony of the family shows that defendant's nursing staff both failed to properly document Marie's condition and failed to communicate her status to the treating physicians.

{¶ 28} The medical records reflect that Marie had 10 out of 10 pain at 11:00 a.m., that Twomley administered insulin to Marie at 11:35 a.m., and that she returned to provide pain medication at 11:55 a.m.  By noon, Marie reported her pain had decreased to 3 out of 10, showing that she was responding to the medication, and her neurological assessment was normal.  Twomley explained that every time a nurse interacts with a patient, the patient is actively assessed.  Twomley provided credible testimony that Marie was not screaming, moaning, or writhing in pain and that such conduct would "get a room full of people very quickly" and be recorded in the medical records.  Although the

court finds that Marie's family heard her complain of severe head pain, no one from her family reported to Twomley that she was screaming, moaning, or writhing in pain and that behavior was not documented in the medical records.

{¶ 29} Plaintiff further asserts that defendant's medical staff failed to recognize the significance of the intensity of Marie's headaches. Plaintiff contends that Marie's reports of experiencing 10 out of 10 headache pain and her self-described "worst pain" headache at 1:00 p.m. should have alerted defendant's medical staff to the possibility of a head bleed and that, at a minimum, the standard of care required a CT scan to assess her condition. Although Dr. Bloomfield testified that 10 out of 10 headaches are rare following acoustic neuroma surgery and that such headaches alone are sufficient to warrant a CT scan, he was the only expert to hold that opinion.

{¶ 30} The court finds that plaintiff's assertion that Twomley failed to recognize and report "sudden onset" headaches is not supported by the evidence. The evidence shows that the headaches Marie experienced on June 18 varied in intensity and responded to medication. All of the medical experts agreed that the level of pain reported by Marie fluctuated throughout the morning and early afternoon. Dr. Brown specifically testified that Marie did not have a sudden onset headache.

{¶ 31} Beerman testified at length regarding Twomley's conduct and the procedures that defendant's nurses followed to care for Marie. Beerman testified that, prior to approximately 2:15 p.m., Twomley had no cause to suspect that Marie was suffering from a head bleed. Dr. Jacob testified that defendant's nursing care was exemplary in both recognizing and reporting changes in Marie's neurologic condition and in preparing her quickly for the CT scan. The court notes that Popovich conceded that defendant's nursing staff acted appropriately after Marie began to experience neurologic deficits after 2:15 p.m. Based upon the evidence, the court finds that the testimony of Nurse Beerman was more credible and persuasive than that of Nurse Popovich. The court finds that Twomley properly assessed Marie's response to pain

medication, conducted appropriate neurological assessments, properly documented her assessments, and communicated relevant information to the treating physicians and her nursing chain of command.  Accordingly, the court concludes that plaintiff failed to establish that defendant's nursing staff fell below the standard of care while treating and attending to Marie.

## CT SCAN REVIEW

{¶ 32} Plaintiff contends that defendant's medical staff "was never called upon to act with urgency because the [3:25 p.m.] CT scan report was misinterpreted as referring to only a subarachnoid hemorrhage, with no urgent decompression surgery needed for a subarachnoid bleed in the brain." (Plaintiff's May 31, 2012 brief, p. 6.)  According to plaintiff, the failure to promptly and accurately diagnose Marie's hemorrhage resulted in delaying surgical intervention, which resulted in her neurologic injuries.  However, Dr. McGregor provided credible testimony that his review of the CT scan revealed that there was blood in both the subdural and subarachnoid spaces.  Dr. McGregor's interpretation of the CT scan with respect to the location of the bleeding was confirmed when he observed blood in both areas during surgery.  Indeed the CT report refers to subdural hemorrhage and notes that the results of the CT scan were discussed with Dr. Hurtuk. (Defendant's Exhibit 12.)  Therefore, the court finds that plaintiff's argument that the decision to take Marie to surgery was delayed based upon a misunderstanding regarding the location of the hemorrhage is without merit.  Furthermore, Dr. McGregor testified that he observed "lots of blood everywhere" in both the subarachnoid and subdural spaces and he visualized changes that were consistent with ischemia and infarct.

**TIMING OF THE SURGERY**

{¶ 33} Dr. Bloomfield testified that Marie should have been taken to surgery within hours after the results of the CT scan showed a subdural hemorrhage and that failing to do so was the proximate cause of her neurological decline. However, Dr. McGregor testified that it would have been "very poor medical judgment" to go to surgery without first performing a ventriculostomy, CTA, MRV, and MRI to determine the source of the bleeding. Dr. McGregor opined that operating without the test results would have been "fool-hearted" inasmuch as an undetected aneurysm or malformed blood vessel could have bled during the operation, causing potentially fatal complications. Drs. Saris and Lipton also opined that Dr. McGregor's decision to order the tests prior to performing decompression surgery was appropriate, timely, and within the standard of care.

{¶ 34} Dr. McGregor opined that CT scan results showed that foregoing pre-operative tests and performing surgery earlier would not have resulted in a better outcome for Marie. As noted above, Dr. McGregor determined that both the CT scan and MRI revealed areas of infarct and showed that blood was present in regions of the brain that were not surgically accessible. Dr. McGregor explained that the goal of the surgery was not to eliminate or reverse damage caused by the head bleed, but to give the cerebellum room to expand and, thereby, prevent secondary injury due to further swelling. Dr. McGregor testified that the "damage from this kind of a hemorrhage happens essentially immediately. There's already injury to the neurons just because the blood has spilled up against them." Dr. Saris also opined that the hemorrhage caused infarction and that the outcome would have been the same had the decompression surgery been performed six hours earlier. Furthermore, Drs. McGregor, Saris, Lipton, and plaintiff's expert Dr. Whiteman, agreed that blood surrounding the brain stem could not be safely removed with surgery. Indeed Dr. Saris testified that such surgery "technically cannot be done."

{¶ 35} Upon review of all the evidence, the court finds that plaintiff has failed to prove either that treatment rendered by defendant's nursing staff fell below the standard of care or that the timing of Dr. McGregor's surgery on June 18, 2008, was a deviation from the standard of care. The court finds that defendant's medical staff properly assessed Marie's condition and that Dr. McGregor ordered appropriate tests to detect the source of her head bleed before performing successful decompression surgery.

{¶ 36} Plaintiff has asserted a claim for loss of consortium. "[A] claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 93 (1992). Since plaintiff has failed to prove his claims of negligence, the loss of consortium claim must also fail.

{¶ 37} For the foregoing reasons, the court finds that plaintiff has failed to meet his burden of proof and, accordingly, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ALAN STANLEY, Guardian, etc.

     Plaintiff

     v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER

     Defendant

Case No. 2009-08683

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

{¶ 38} This case was tried to the court on the issues of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant.  Court costs are assessed against plaintiff.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Daniel N. Abraham
David I. Shroyer
536 South High Street
Columbus, Ohio 43215

Timothy T. Tullis
Traci A. McGuire
Special Counsel to Attorney General
Capitol Square Office Building
65 East State Street, Suite 1800
Columbus, Ohio 43215-4294

004
Filed October 29, 2012
Sent to S.C. Reporter February 28, 2013